Good morning, Your Honor. May it please the Court, my name is Brody McBride. I represent appellants Mr. and Mrs. Emmons. With the Court's permission, I'd like to reserve any of my unused time for rebuttal. Sounds like a plan. As this Court noted in Espinosa v. City and County of San Francisco, the emergency exception to the Fourth Amendment is narrow and its interfere with the sanctity of the home. This case is about one of the most fundamental rights protected by the Constitution, the Fourth Amendment's right to be free from unreasonable searches and seizures. More particularly, this case is about our right to be free from warrantless intrusions into the home by police officers. And as the U.S. Supreme Court noted in Payton v. New York, that is the chief evil against which the wording of the Fourth Amendment is directed. Under the Fourth Amendment, warrantless searches are per se unreasonable unless officers can show that the warrantless intrusion falls within a carefully limited category of exceptions. We've got here a call to the officers from the mother of the roommate who says, my call to my daughter was cut off, they were screaming and yelling, and so essentially they're going out to do a welfare check, correct? That was the testimony of the officer. Well, and there's no evidence to the contrary. So for purposes of summary judgment, we know they were going out to do a welfare check, correct? Yes, Your Honor. And I've watched the video, I suspect everybody on the panel has. They go to the side window and Mrs. Emmons is, to put it mildly, agitated. She's saying, you can't come in, you can't come in, but she's yelling and they keep asking to come in. At what do you think that their ability to go in and make the welfare check went away? Because we do recognize an exception to check for welfare when you have information that there's a problem. They go to the window and Mrs. Emmons acts, I think, in an agitated way, to be fair. At that point, do they still have an exigency that allows them to enter? If not, when does it dissipate? Well, Your Honor, I would disagree with the court's characterization of Mrs. Emmons as agitated. This was an incident that developed over almost 12 months. So just tell me, under your view of the facts, taking them into light, most favorable to your client, when, on the way out there, they had an exigency. When did the exigency leave? When did it dissipate? Well, I would disagree, respectfully, Your Honor. I don't believe that the officers, there was any exigency that would have justified a warrantless entry or any emergency, ongoing emergency, that would have ever... So let me change the facts for you a little bit. Let's assume that no one comes to the window. The officers have a check welfare call from somebody who says there's some sort of violence going on inside this apartment. And they knew there had been a previous domestic violence call at that address. A week before. A week to 10 days before there'd been a domestic violence call at that address. Nobody answers the door. Can they? But they hear people inside. Can they force their way in? No. And again, I disagree with the court's characterization, slightly, of the previous domestic violence call. I can address that later. Well, the record makes clear there had been a domestic violence call at that address the week before. Whether or not anybody was guilty of domestic violence is not the issue. The officers on the way out knew, they were told, and their testimony is unrebutted, that this was the scene of a previous domestic violence call. Let me answer your Honor's question about the previous call first, and then I'll get to the exigency question. The previous call dealt with Ms. Simmons calling the police officers to help remove her husband from the house. It didn't involve violence. It was a domestic dispute. But at the very least, even under your view of the events, the police officers are on the way out. They've gotten a call from someone that says there's possibly violence going on inside the apartment, and they knew that there had been an incident the week before where they'd been called out to remove Ms. Emmons' husband. Now, you take all those facts. Is it your view that if nobody showed up at the door at that point, they would not have exigency that would allow them to enter without a warrant? Yes. I don't think they would have justified. And I don't think that this call actually, the 911 caller, even though it was second-hand and from another city, didn't say that there was domestic violence going on. No, she said that there was a verbal argument. She said the call was dropped, and she couldn't get an answer from her daughter when she tried back, and there was shouting. That sounds, as a parent, that sounds pretty terrifying. Why isn't that sufficient, even without knowing of a previous incident, to go make sure she's okay? You don't dispute that there was a factual basis for a welfare check, do you? I do, Your Honor. Well, so the police could have just said, we're not going. The heck with it. You've called. You've told us there's a problem going on in the apartment. We know there was something there the week before, but we're not going because there's no factual basis for a welfare check. I guess it depends, Your Honor, on how you would define welfare check. I think that there was a basis for officers to respond and investigate. Yeah, and that's what they said. They were there for a welfare check. Sure, which... So at what point did the necessity to conduct the welfare check abate? Well, so I would look to this court's prior precedent for instruction on this. One of the cases we cited, Martin v. City of Oceanside, a case in which this court upheld a warrantless intrusion based on the emergency exception. The officer in that case showed up, received a call from the woman's father who lived in Oregon, similar to this case, said he was worried about his daughter, hadn't heard from her for a few days. The officer showed up. He immediately started investigating, trying to put together facts that would support a reasonably objective basis that there was an emergency inside. But this isn't a matter of finding a case exactly like it. These cases all rise or fall on the unique circumstances. And I think what's... It's not especially helpful to me, at least, to say it has this slight difference from another case or this slight similarity of another case. I guess I just still don't understand what it is you expected the officers to do when they arrived that should have been done differently. And let me suggest what we're looking for. Is it your position that once they talked to Ms. Emmons at the window, they should have known there was no problem and left? At what point... We all seem... We're all focusing on, at what point do you think the officers should have said, okay, I don't need to go inside? I understand, Your Honor. I would have said within minutes when the officers responded, Ametria Douglas. This was the person on whom they were sent to check. She was outside the apartment, less than 10 feet away, floating in the pool with the two kids. She ID herself to the officers. She said, hey, I'm Ametria. I live there. The officers told her, this doesn't concern you. Basically, mind your own business. If the officers would have contacted her, asked her, you said you're Ametria. Oh, that's the person we're here to check on. Do you have any ID? Hey, what happened in there? Was there an altercation? Is there anybody injured in there? Are there any weapons in there? If they would have done that at the very beginning when she contacted them, it's undisputed she contacted them within several minutes of them arriving. You can see that in the video. If they had done that, the need to conduct the welfare check as the court has framed it would have ended right there. You have about a minute and... A little more than a minute and a half if you'd like to save it for rebuttal. No, if the court... May it please the court. Michael McGinnis on behalf of all defendants and respondents. Real world law enforcement often places officers in an extraordinary position to make fast decisions under tense and unknown circumstances. Well, what's wrong with the argument we just heard at the very end, which is they're going to check on a particular individual because she hung up the phone and couldn't be reached again and the mother was worried. And she says, hey, this is me and I'm fine. Why isn't that enough to dissipate the exigency? Well, what we know from the call was that the incident took place inside the apartment. That's at least the nature of the 911 call. There was no call back from the woman who had called Amitra's mother saying there's no problem there, there's no issues. The officers don't receive any other information from dispatch that the problem is no longer there or that the persons have left the apartment. The information that they received though does indicate that the person that they're supposed to check about is Amitra, is it not? They learned that, yes. Okay. They learned that before they went to the apartment, at least the officers who were the first responders, they didn't know about Amitra, did they? No. I think the problem is... Before they enter, they know about it. Before they enter, don't they know about Amitra? I think that the nature of the call from 911 was my daughter was involved in some kind of incident, but nobody really knows what the incident was. Was it incumbent upon them going to, being dispatched to the scene to have more facts from which they could have made an assessment that if Amitra was in the pool and said, hey, I'm okay, then that obviates the need for them to engage with Ms. Emmons at the window, doesn't it? I do, but I think that it was a dynamic situation that was unfolding before them. If you recall as well, what they learned from Ms. Emmons at the side window was in fact there was screaming inside the apartment. There were children inside the apartment. She had threatened violence against outside the apartment. The officers did not know. Well, they saw them. But they didn't know those children were from that apartment. They were told that these were the children and they were told that this was Amitra and that I'm fine. At what point do the officers have to accept what Amitra says or do they not have to at all? I think it is an evolving situation. That's why these are so difficult and that's why qualified immunity is so critical to officers on the scene. Let me post to you what I see watching this tape. The officers show up in the scene. We don't see it on the tape, but everybody agrees. Demetria says, I'm okay and the kids are with me. They're in the pool. They go to the window and Ms. Emmons says, I was yelling at the kids before, but they're down at the pool. They wanted to go to the pool and I told them they couldn't, but they're down at the pool now and I don't want you coming in my apartment. And what I see the officers saying at that point is, we have to come in your apartment. And it's not a quickly evolving situation because they call a supervisor and it takes 11 minutes or so on the tape for the supervisor to show up and for them to say we're going in. And so the question is, why do they need to go in at that point? I don't think the record is as clear as the court may view it that they knew that those children were at the pool. The children that were in the apartment that was identified by the number. Didn't Ms. Emmons actually say that at the window? I don't believe that she ever identified those children as the children in her apartment. No, she did say, I was yelling at my children. She did, but we don't know that the children down at the pool are the same children. And so she's threatening violence against her. She's telling the officers, she's telling them why she knows that they're there. And yet she's pretending she doesn't know why they're there. I think, I think one can divine that from the nature of her conversation. I'm still trying to focus on, and I understand your qualified immunity point. Once you get this welfare call, are the officers inevitably authorized to go inside the apartment? Or does that depend on the nature of their investigation? Once they get there, they don't show up as if they must be in the right way. They have a long conversation with Ms. Emmons at the window. They call the supervisor and ask for the real question is, when does their right to enter the apartment? Was it there from the beginning? Did it go away? I'm having the same difficulty with your argument that I did with your colleagues. It didn't go away. Because what happens again is the nature of the event is transforming. Because if you recall, Officer Leffingwell eventually gets to the apartment and has that conversation with her at the side window. He was not involved in the original incident that's happening outside the door. If you recall, Marty Emmons at this point is now being arrested and being questioned. So Officer Leffingwell, a PERT officer, the Psychological Emergency Response Team officer, is having this conversation with her. He's the one who goes in. So the nature of the incident starts out as a 911 call welfare check. It begins to become dynamic because she's yelling at the window. There's confusion about who's down at the pool. She starts to tell them that the children had been threatened with violence. She didn't say threatened with violence. She said I was yelling. She was going to hit them. I was yelling at my children. Besides that, in the emergency call, it wasn't about the children. Children plural. It was about a METREA who was an adult child of the emergency caller. So they didn't come there to check on the children. They came there to check on a METREA. But I think it's fair that when officers hear that there are children in an apartment and you don't really know what that is, it comes to a dispatch. Wasn't it their responsibility to know what they were going to investigate? They were. They were trying to find out what happened inside that apartment. No, they were trying to find out what happened to a METREA. There's a difference. And so when you broaden the scope of their search, then you can justify any type of emergency. When you say, well, we were there to see what happened in the apartment. What happened in the apartment? The thing that happened in the apartment was a call to a METREA was dropped. A METREA identified herself and said, I'm okay now. So had the officers found out before they left who they were going to check on, then maybe all of this would have been avoided. Well, one of the things I think the legal landscape demonstrates without question is you don't need to accept an innocent explanation and just walk away. I guess the hard part of this case is that a rapidly changing situation can change in either direction, further supporting an entry or in the other direction, dissipating the need for the entry. And it seems to me that each of you is arguing that it can only go one way. It's not a one-way ratchet. That's what makes the case challenging is that in some respects, it seems that the situation became less problematic because a METREA had identified herself and said, I'm okay. And on the other hand, the shouting they first learned involved shouting at some children, and that could create yet a different exigency potentially. And I would submit that that is the very moment why qualified immunity is so critical to officers. It's not just to get out of jail free card. It is a recognition that officers are facing these ever-changing circumstances. And if you look at the legal landscape of cases that talk about, particularly in the case of domestic violence, and I'm not suggesting that domestic violence in and of itself is the trump card. That's not what I'm saying. It is a critical factor in the way officers view what's happening during their event, what they're hearing. They're seeing somebody who's nervous and agitated. The court has already acknowledged that that's what you see. And I think that's what a reasonable officer would see. Why is she so aggravated, agitated? She's talking over the officers who are doing nothing but courteously, contemporaneously, and repeatedly telling her why they're there. They're just trying to get her to understand why they're there, and she's not having any of it. Can I ask you a question before you sit down? It's a question about Marty. Very difficult to tell on the tape what happened, but does the excessive force claim on his behalf rest on whether or not the police had the right to enter? Because they were using the force on him, I take it, because he was closing the door. There's no evidence that he used any force. That's true. He comes out, and apparently, all we can tell from looking at the tape and what the officers say, and what he says, is he closed the door and they threw him to the ground. So if they didn't have the right to enter, was that excessive force? I would say not necessarily, because the Penal Code Section 148 requires simply that the officers are in their performance of their duties. Entry and exit is not necessary to the performance of their duties. It was getting there on the welfare call. In what way were they performing their duties, putting him to the ground, if it was not in order to get into the apartment? He didn't come out and threaten violence. He just came out and said, and the next thing, and he's apparently shutting the door behind him, or blocking the door behind him as he comes out, and they put him to the ground and say, you're blocking the door, and they want to go in. So if they don't have the right to go in, wasn't that excessive force? Well, in the first instance, they clearly have the right to go in. That's our position. On the excessive force, I believe the officers are in the performance of their duties, whether they're going in or not. They're there to check on the welfare. Now, are they still having a conversation with Ms. Emmons when an unknown individual starts to walk out of a door of a case? No, she said they hear her talking. Look, to be fair, they hear her talking to Marty inside, and one of the officers says, the husband or the man is going to come to the door. Maybe we can talk some sense into him. So it's not an unknown person coming to the front door. They've directed him to the front door so they don't have to deal with her because she's agitated. I don't believe that the record reflects that. I believe all they hear him say is Officer Craig says, I think he's going to try and talk some sense into her, but they have no idea he's coming out. There's no announcement that he's going to come out. They have no idea who he is. She never identifies him. That is Ms. Emmons. So because they don't know who he is, they can take an older man to the ground and handcuff him because they don't know who he is. He was charged with willful resistance, delay, and obstruction. I looked at the tape to find the willful resistance, delay, and obstruction because I was assuming that they believed that they had probable cause to arrest because he had committed these offenses. So could you explain to me, in the context of Judge Hurwitz's question, why he was arrested in the first place? I'm over my time. If it's okay, I might finish. Please answer and then you can sit. Thank you so much. Penal Code Section 148 allows an officer to arrest somebody with probable cause if they believe that the person is delaying obstructing the officer in the performance of the duties. The officers are investigating a 9-1-1 call at that apartment. They're in the right place. They have a man. They don't know who he is. There's no reference in the 9-1-1 call as to who he is. There's some potential event of violence happening in here. Unannounced, a man comes out of the door. And if you look at the tape, he's coming out in an awkward way. Even he admits that he's obstructing their efforts to get into the house. They know why. He knows why they're there. He's at the window listening to it. I think Officer Craig could reasonably have found that. So probable cause is a fairly low bar. Is there a probability of a crime? The officers at this point are investigating this incident. They have a man coming out. He could have evidence. He could have a weapon. All they're doing is securing him while Officer Leffingwell is still trying. So before he has an opportunity to ask any questions about whether he has a weapon or whether he's armed, the default position always is to take him down and handcuff him? It is the most secure way to... Plus he was an old guy. He wasn't Adonis coming out of the doorway. And so at some point, aren't officers tasked with the responsibility of looking at who they're dealing with? So what if he had been a seven-year-old who was a tall seven-year-old? The fact that he just came out the door in an awkward position where there had been purported violence in the apartment would justify taking him down to the ground? Not a seven-year-old, but this is a large individual. You see him on the videotape later. Old guy. But when you see him coming out, they had no idea what he looked like until he came out backwards out of a door. So I would submit to you... So the Pavlovian response then is take him down, ask questions later? No. The right thing to do, the fast thing to do, and the most secure thing to do for the officers who don't know who he is, is to secure him as quickly as possible when you have a potential violent incident happening inside an apartment. Thank you, Counselor. Thank you so much. Thank you, Your Honors. Very briefly, I just wanted to make clear one fact to the court, that the officers were aware of the identity of the individual on whom they were sent to check. It was in the CAD, the dispatch. The information went out. It was Ametria Douglas. She was 24 years old. They had that information at their deposition. Both of the first officers to respond testified that they knew that. And opposing counsel raised the issue of real-world consequences in policing. And in this case, just even for the sake of officer safety, there are some things that the first officers on the scene should have done. They should have, at a minimum, talked to Ametria when she identified herself. They should have, at a minimum, asked Ms. Emmons, who they were engaged with at the window, hey, this is why we're here. Somebody called from L.A. Let me stop you for a second. The difficulty is not whether they were negligent. I think I could find that they weren't reasonable under the circumstances. The question is whether or not they have qualified immunity, which is to say whether there's some case that clearly establishes that their course of conduct was wrong. So what's your best case that says that? Well, I would say we've got a number of good cases. If you've got a number of good ones, then you must have a best one. Give me your best one. Martin v. City of Oceanside. I think that's the case that most clearly tracks... But doesn't Martin approve a search? It does. So give me one that disapproves one. Well, I don't think that that's actually what's required. Well, I think it might be, because Martin doesn't say if we had something less. It doesn't say this is the floor, this is the minimum. That's what I was trying to get at earlier. It says here's the constellation of facts and here's the answer. But it doesn't set a floor. It doesn't say anything that differs from this isn't good enough. Well, I think if you take the four cases that we did cite together, Brooks, Black, Brown, and Martin, I think those cases together clearly established the contours of the right we're talking about. But is there a case among them, and that's why I'm having difficulty, in which the court said this search was unconstitutional so that the fictional police officer... This is the Supreme Court's problem. They created it. We didn't. Reading the cases would have said, ha, I can't do this because there's a case that tells me I can't. Well, two-part answer to that, Your Honor. I would say that that is a case on all fours is not what's required. I understand. No, but every single one of the cases you call your best case approved the entry. Right. And that's my problem. I'm trying to find a case that says, no, this entry is no good, so that a police officer reading it would say, okay, now I know the entry into Ms. Emmons' apartment is no good. They do, Your Honor. And if you take those four cases together... But they're all ones that approve searches. They are. Do you have one that doesn't? I don't, Your Honor, but I don't think that that's what's important. And I think what's critical is that these four cases taken together show that at a minimum, in order for an officer to make a warrantless entry into a home, they must have an objectively reasonable belief that there's an emergency at hand and an immediate need for their assistance to protect life or property. If you look at the officer's own words and conduct in this case, they did have an objectively reasonable belief that there was an emergency at hand. Thank you, counsel. The case just argued is submitted, and we appreciate very much the arguments of both of you.
judges: Graber, Hurwitz, Marbley